**UNITED STATES**

v.

**Donal M. BILLIG, 119 24 6838, Commander (0–5), U.S. Naval Reserve.**

**NMCM 86 2829.**

U.S. Navy–Marine Corps Court of
Military Review,
En Banc.

Sentence Adjudged 3 March 1986.
Decided 13 April 1988.

LCDR ROBERT J. SMITH, JAGC, USN, Appellate Defense Counsel.

Capt MARK FOSTER, USMCR, Appellate Defense Counsel.

LT DEBORAH D. SORKIN, JAGC, USNR, Appellate Defense Counsel.

Maj F.F. KRIDER, USMC, Appellate Government Counsel.

CDR PETER J. MCLAUGHLIN, JAGC, USN, Appellate Government Counsel.

LT DIANE H. CORNING, JAGC, USNR, Appellate Government Counsel.

RILEY, Senior Judge:

Commander Donal Billig, a cardiothoracic surgeon and the head of the Cardiothoracic Surgery Department at Naval Hospital, Bethesda, Maryland (Bethesda), from June of 1983 to March of 1985, was charged with 24 specifications of willful dereliction of duty arising out of his alleged failure to have a supervisory surgeon present during various open heart surgeries performed in the summer of 1983. He was also charged with five specifications alleging involuntary manslaughter arising out of coronary artery bypass surgeries performed at Bethesda between March of 1983 and November of 1984. At a general court-martial with members, he was found

guilty of twelve specifications of willful dereliction of duty, four specifications of negligent dereliction of duty, two specifications of dereliction of duty through culpable inefficiency, all in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892, as well as two specifications of involuntary manslaughter and one specification of a lesser included offense of negligent homicide in violation of Articles 119 and 134, 10 U.S.C. §§ 919, 934, respectively, of the UCMJ. He was sentenced to confinement for four years, total forfeiture of pay and allowances, and to be dismissed from the Naval Service. The convening authority approved the sentence as adjudged.

Oral argument was originally heard by a panel of this Court. Shortly thereafter, and before that panel took action, the Court decided to hear the case *en banc* and ordered additional briefs and oral argument. Appellate defense counsel has raised seven assignments of error for our consideration.

## I.

THE MILITARY JUDGE ERRED IN ADMITTING THE TESTIMONY OF DR. HAROLD RHEINLANDER AND DR. MANFRED COHEN AND BY ADMITTING PROSECUTION EXHIBIT 60, APPELLANT'S DECREDENTIALING AT THE MONMOUTH MEDICAL CENTER.

## II.

THE MILITARY JUDGE ERRED BY ALLOWING THE TRIAL COUNSEL TO CROSS–EXAMINE APPELLANT ABOUT HIS PRE–SERVICE USE OF MARIJUANA AND AMPHETAMINES.

## III.

APPELLANT'S FOURTH AND FIFTH AMENDMENT RIGHTS WERE VIOLATED WHEN HE WAS ORDERED TO SUBMIT TO A COMPLETE EYE EXAMINATION ON 16 MAY 1985.

## IV.

APPELLANT'S FOURTH AMENDMENT RIGHTS WERE VIOLATED WHEN HE WAS ORDERED TO SUBMIT TO MAGNIFIED PHOTOGRAPHS OF THE INTERIOR OF HIS EYE ON 25 OCTOBER 1985.

## V.

IT IS AGAINST PUBLIC POLICY TO PROSECUTE MILITARY MEDICAL PERSONNEL FOR NEGLIGENT HOMICIDE COMMITTED IN THE COURSE OF MEDICAL TREATMENT.

## VI.

THE GOVERNMENT FAILED TO PROVE APPELLANT GUILTY OF NEGLIGENT HOMICIDE AND INVOLUNTARY MANSLAUGHTER UNDER CHARGE II BEYOND A REASONABLE DOUBT.

## VII.

A SENTENCE WHICH INCLUDES FOUR YEARS CONFINEMENT IS INAPPROPRIATELY SEVERE UNDER THE FACTS OF THIS CASE.

Not only do we concur with assignment of error VI as to the lack of convincing evidence regarding the involuntary manslaughter and negligent homicide convictions under Charge II, we are also not convinced beyond a reasonable doubt of the appellant's guilt of any of the derelictions set forth in the specifications of Charge I. That is, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the Court itself is not convinced of the appellant's guilt beyond a reasonable doubt. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). We shall set aside all findings of guilty based on this factual insufficiency of the evidence.[1]

---

**1.** Since the resolution of this case is based on our reasonable doubt as to guilt, all other assignments of error are moot. It should be noted, however, that one of the driving factors

## I.

■ Under Charge I, Dr. Billig was convicted of 18 derelictions of duty by failing to have a fully credentialed surgeon present during 18 of the operations he performed at Bethesda from 17 June 1983 to 7 September 1983. At trial, the Government asserted that Dr. Billig was required, by virtue of his credentialing status at Bethesda, to be supervised during all heart surgeries. This would require a fully credentialed cardiothoracic surgeon to be present in the operating room with the appellant, and it was presumably Dr. Billig's duty to ensure that such a supervisor was present. Dr. Billig, on the other hand, argued that he was under no such restriction during the period of the alleged derelictions (although he had been earlier) and that even if some form of supervision were still required, the situation regarding his surgical status was so confused and frequently shifting that he could not have reasonably understood the parameters of his surgical privileges. We agree with Dr. Billig.

The evidence of record reflects that there were two separate and distinct sets of limitations on Dr. Billig's surgical privileges, each of which was evolving during the summer of 1983.

### A. The "PAPER" Limitations

The appellant routinely applied for full surgical privileges on 14 January 1983, shortly after he arrived for duty at Bethesda. His application was favorably endorsed on 24 February 1983 by Dr. Schwartz, then head of the Cardiothoracic Surgery Department, but with the provision that Dr. Billig undergo a two-to-five month period of retraining in cardiothoracic surgery, since he had not been active therein for several years, although he had been performing other types of chest surgery.

In addition, she recommended that he not be fully credentialed or allowed to operate unsupervised until approved to do so by Dr. Zajtchuk (Colonel, U.S. Army), then chairman of Cardiothoracic Surgery at Walter Reed Army Medical Center (Walter Reed) and also a major contributor to Bethesda's Cardiothoracic Surgery Department. Dr. Zajtchuk and his staff were to supervise appellant's period of retraining. Dr. Billig's application was apparently approved by the Commanding Officer since his signature appears on the form letter. Neither of the words "approved/disapproved" was crossed out, however, and his signature is undated.

On 9 June 1983, Dr. Schwartz submitted a letter to the Bethesda Credentials Committee recommending that Dr. Billig receive unrestricted surgical privileges. Dr. Schwartz noted therein the approval of Dr. Zajtchuk, and she further recommended that Dr. Billig be appointed as the head of the Cardiothoracic Surgery Department upon her imminent transfer from the hospital. The Credentials Committee first considered Dr. Schwartz's recommendation at its meeting on 30 June 1983, but took no action thereon because of a hospital requirement that all requests for the upgrading of surgical privileges be initiated personally by the surgeon affected.

Dr. Billig was so advised and, by letter of 6 July 1983, he formally requested unrestricted privileges, noting therein the approval of Drs. Schwartz and Zajtchuk, and stating that he had earlier been granted temporary unrestricted privileges pending the meeting of the Credentials Committee. The committee granted Dr. Billig full privileges on 25 August 1983, and he was named the head of the Cardiothoracic Surgery Department shortly thereafter.[2] The committee action of 25 August 1983 was

---

which encouraged the Court to decide this case *en banc* was the issue raised by the appellant in Assignment of Error V. As best we can determine, Commander Billig is the only physician in the history of both military and civilian criminal law in the United States to be convicted of negligent homicide for simple negligence during the course of patient treatment or surgery. Our concern is whether such a result is permissible under Article 134, UCMJ, (*see generally United States v. Kick*, 7 M.J. 82 (C.M.A.1979)), and also

whether the notice requirements of Article 134, UCMJ, have been met under these circumstances. *See Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), and *United States v. Van Steenwyk*, 21 M.J. 795 (NMCMR 1985).

2. The letter appointing Dr. Billig as the department head was dated in August but stated that the appointment was "retroactive to June 1983."

approved by the Commanding Officer on 8 September 1983. Given this factual background, it can be reasonably argued that Dr. Billig was required to be supervised in all of his surgeries until at least 8 September 1983 when his full surgical privileges were approved. The testimony of both government and defense witnesses at trial, however, revealed a starkly contrasting picture.

### B. The "SUB ROSA" Limitations

On 9 June 1983, the date of her letter recommending Dr. Billig for full privileges, Dr. Schwartz, Dr. Quinn (Commanding Officer of the hospital), Dr. Cochran (Director of Surgical Services), Dr. Fletcher (Acting Director of Surgical Services for most of the summer of 1983), and Dr. Zajtchuk met to discuss Dr. Billig's surgical privileges. At that meeting it was the consensus of opinion that Dr. Billig was not yet at such a level of surgical skill that he could be given full privileges. It was agreed, however, that he was sufficiently along in his retraining that he could operate unassisted on some less complicated or "routine" heart surgeries. Accordingly, the decision was made that Dr. Billig would continue to be supervised by the Walter Reed surgeons in those cases that they felt he could not handle alone. They would review his cases in advance and determine which ones he could perform without their supervision.[3]

On 29 June 1983, there was another meeting concerning Dr. Billig's privileges. This meeting was attended by Dr. Billig as well as Drs. Cochran, Zajtchuk, Head (a Walter Reed surgeon), and Fletcher, and was meant to clear up any confusion concerning surgical limitations.[4] At that meeting, it was made clear to Dr. Billig that he could handle the "routine" cases on his own but not the "complex" ones.

Thus, during the summer and fall of 1983, Dr. Billig, while not possessing full surgical privileges on paper, was, by virtue of a *sub rosa* arrangement, allowed to operate without supervision on "routine" bypass surgeries. The only remaining question is whether he himself was to make the determination as to which cases were "routine" or whether the Walter Reed surgeons had to make that decision. There is conflicting evidence on this question. For example, while Dr. Cochran testified that the determination of whether a case was "routine" was to be made by the Army surgeons, Dr. Fletcher testified that Dr. Billig was to consult with the Army on only the "complex" cases, thus suggesting that the judgment call was Dr. Billig's to make. Likewise, Dr. Head, who was Dr. Billig's primary point of contact at Walter Reed during May and June of that summer, testified that Dr. Billig was required to seek help on cases considered to be "more than routine." In other words, "[I]f Dr. Billig thought it was complex, he would call us."

In any event, the status of Dr. Billig's surgical privileges during the summer of 1983 was confused to the point that many of the doctors involved with his operating privileges had different views of the situation. Perhaps the best that can be said is that no set procedure existed, and that the limitations on his privileges were enforced by using somewhat of an unstructured honor system under which Dr. Billig would operate unsupervised only on "routine" cases, and would consult with fully credentialed staff on the rest. The record supports this view.

**3.** The reason why the Walter Reed staff was used as the primary means of supervising and retraining Dr. Billig during the spring and summer of 1983 was that there were no qualified cardiothoracic surgeons present at Bethesda. Dr. Schwartz was transferred to San Diego in early June, and the only other fully credentialed surgeon, Dr. Peniston, was preparing to leave the Navy. It is all too apparent from the record that, because of these personnel changes, Dr. Billig represented the hospital's only chance of retaining its status as an accredited teaching hospital in this specialty.

**4.** This meeting was scheduled in the wake of an unsuccessful bypass operation performed by Dr. Billig and Dr. Ryan on a patient by the name of Spalding. The surgery was complex in that it involved multiple bypasses as well as the replacement of a heart valve. The meeting was called apparently because it was felt that Dr. Billig should not have performed the operation without help from the Walter Reed surgeons. One of the 18 dereliction of duty convictions stems from this operation.

The evidence indicates that each operation which was the subject of a dereliction under this Charge was categorized as "routine." [5] Additionally, every cardiac surgery performed at Bethesda was listed on a daily surgical schedule which was approved by the Director of Surgical Services, the Executive Officer, and, ultimately, the Commanding Officer. This schedule listed all personnel involved, including the primary surgeon, the first assistant, and the supervisor. The hospital administration knew when and under what circumstances Dr. Billig was operating each day, and either affirmatively approved the surgeries, or, at the very least, condoned the practice. Lastly, no report was ever made to the surgical supervisors at Bethesda that Dr. Billig was exceeding his established limitations or that he was operating without appropriate permission or supervision. In short, the day-to-day operations at the Bethesda Cardiothoracic Surgery Department went smoothly during the summer of 1983, and it was not until over a year later that Dr. Billig was charged with any dereliction in connection therewith.

What is perhaps most disturbing about this aspect of the case is the cavalier and secretive manner in which surgical privileges were awarded to Dr. Billig. Beyond the initial application for privileges submitted to the Credentialing Committee in January of 1983, there was *no* documentation or memorialization of Dr. Billig's status until he formally received full credentials in September. Yet between January and September, he operated on scores of patients, many times as the *supervising* surgeon. Although we might find it difficult to determine exactly what his surgical limitations were within a set time frame, we have no problem determining with certainty that the appellant's surgical status during the summer of 1983 was in a state of confusion. Given these circumstances surrounding Dr. Billig's surgical status in

particular, and the credentialing process (as it then existed at Bethesda) in general, we are not convinced beyond a reasonable doubt that the appellant was derelict in any duty as set forth in the specifications under Charge I.

## II.

We now turn our attention to the much more serious crimes of which the appellant stands convicted, that is, the two involuntary manslaughters and the negligent homicide.

### A. The Kas Operation

Lieutenant Colonel Kas was a retired U.S. Air Force officer, age 67, with coronary artery disease and aortic stenosis, that is, a narrowing of his aortic valve which impeded the flow of blood from the left ventricle into the aorta. On 29 October 1984 he was operated on by Drs. Billig and Haggerson to replace his aortic valve and to install two coronary artery bypass grafts. Dr. Haggerson was the primary surgeon and Dr. Billig was the first assistant and supervisor. During the course of the operation a number of difficulties were encountered.

The first problem involved the inadvertent initial grafting of a saphenous vein [6] to a coronary vein rather than a coronary artery. The mistake was discovered and the bypass was then properly grafted to a coronary artery. This misidentification of a vein as an artery, however, added about 30 minutes to the limited time that can be safely spent on the cardiopulmonary bypass machine, through which the blood is circulated during that portion of the operation when the heart is stopped.

The surgeons then proceeded to replace the aortic valve. The aorta was opened, the natural valve was removed, and the prosthesis was inserted. Difficulty was encountered, however, in getting the new

---

5. The only exception is the Spalding operation which Dr. Billig himself admitted was a more complex case. However, there is evidence that both Dr. Billig and Dr. Ryan consulted with Dr. Peniston, a fully credentialed Bethesda surgeon, prior to surgery and received his approval to proceed together. This undoubtedly was an adequate substitute for "Walter Reed" approval.

6. A saphenous vein is described as a large, superficial blood vessel removed from the leg and grafted onto the heart during bypass surgery to deliver blood around blocked coronary arteries.

valve seated properly in the aorta because blood from the patient's bronchial circulation started to flow into the left ventricle, thus blocking the surgeons' field of vision. Cannulas and catheters were inserted through the valve in an effort to clear the field of blood but were generally unsuccessful. As the ventricle became full and distended, Dr. Billig decided to remove the blood by inserting a sump drain in the left ventricle. He did so and then placed a series of purse-string sutures around that vent.[7] The blood drained from the ventricle and the surgeons successfully seated and tied down the new valve. The aorta was then closed and the surgeons began to wean the patient off the bypass machine. In the process of coming off the bypass, the vent was removed and the wound was closed by pulling the purse-string sutures together. During this procedure, however, some of the sutures tore through the heart tissue and bleeding ensued. Lieutenant Colonel Kas was placed back onto the bypass machine and the appropriate repairs were accomplished. He was then successfully weaned off the bypass. As the surgeons prepared to close the chest, the tear redeveloped. Dr. Billig elected to repair the bleeding site without putting the patient back onto the bypass machine and he placed another pledgeted suture onto the area of bleeding by lifting the heart to expose the apex and accomplish the repair. The lifting of the heart, however, caused a drop in blood pressure and damaged the myocardium (heart muscle), which became edemetous (swollen). Because of the swelling, the patient's chest could not be closed after the repairs to the apex were completed. The surgeons decided to pack the chest with sterile dressing and bring the patient into the intensive care unit (ICU) to allow the cardiac function to stabilize and the swelling to reduce. It was anticipated that the swelling would dissipate within 48 to 72 hours, at which time the chest could safely be closed.

7. The sump drain is essentially a straight plastic vent which is inserted through the wall of the heart. After placing the vent in the heart, a series of "purse-string" sutures are placed in the

Lieutenant Colonel Kas entered the intensive care unit at approximately 1748. Upon arrival his condition was considered to be "hemodynamically stable", that is, stable enough to be transported from the operating room. Both Dr. Haggerson and Dr. Licina (the anesthesiologist) accompanied the patient to the ICU. Over the course of the next hour, Dr. Haggerson and Dr. Licina treated him in an effort to maintain a steady blood pressure.

Heavy bleeding from the chest was discovered by a unit nurse around 1900 as the patient was being positioned for a chest x-ray. Dr. Haggerson was notified by the nurse, but apparently nothing was done until 1930 at which time he unpacked the chest and began replacing the soaked dressings with new ones. At that point, Dr. Edwards arrived and began to assist Dr. Haggerson. The patient was transfused with several units of blood to keep his blood pressure stable and Dr. Edwards attempted to contact Dr. Billig. According to her testimony, she called Dr. Billig's "beeper," his home, and his office but did not receive a response. She did not attempt to contact any other staff surgeon in the hospital.

Dr. Billig arrived at the ICU approximately 45 minutes later at 2014. He initiated attempts to stop the bleeding by suturing the apex of the heart. When Dr. Billig began the suturing, however, Lieutenant Colonel Kas went into cardiac arrest and Dr. Haggerson began open heart massage. After about 15 minutes of heart massage, Dr. Haggerson's thumb went through the right ventricle and the patient exsanguinated. Dr. Billig was charged with and convicted of involuntary manslaughter.

In its pleading, the Government alleged three main acts or omissions by Dr. Billig constituting culpable negligence. First was his "improper placing and repairing" of the left apex vent. Second was his "improperly identifying and grafting a

heart around the vent and are designed to be pulled together like a drawstring purse when the vent is subsequently removed.

saphenous vein graft to a coronary vein rather than the posterior descending coronary artery." The third was his "improperly overmanipulating or improperly allowing to be overmanipulated, the tissue of the heart, thereby wrongfully causing inadequate myocardial protection, excessive cardiac strain, edema, and hemorrhage...." [8]

Both at trial and in oral argument before this Court, the Government's case focused extensively on the selection and use of the left apex vent. The thrust of the argument was that Dr. Billig was culpably negligent in selecting the apex vent because it carried with it the inherent risk of uncontrollable bleeding from the site of entry and because its use places a heavy premium on the proper installation of the purse-string sutures. The linchpin of its case in this regard was the testimony of Dr. Haggerson, who stated that during the operation he warned Dr. Billig that he (Billig) was placing the purse-string sutures too shallowly around the vent site.

■ We are unconvinced by the Government's argument. Regarding the selection of the vent, we reject the notion that its use was *per se* improper. Testimony from defense and government experts alike indicates that the apex vent *is* an acceptable means of venting blood from the heart, although it is not used extensively because of the risk of uncontrollable bleeding and because of the existence of other less hazardous means of achieving the same result. Simply because this vent has risks inherent in its use, however, does not make its use improper. The record reflects that Dr. Billig used the vent because he was unable to clear the left ventricle of blood, could not properly seat and install

the aortic valve prosthesis, and needed a fast and efficient means to drain the left ventricle. He testified that he was aware of the availability of the superior pulmonary vent (a less hazardous option), but chose the apex vent because of the difficulty in installing the superior pulmonary vent at that stage of the operation, *i.e.*, where the aorta was already opened and the valve prosthesis partially installed. He also testified that he had used the apex vent hundreds of times in the past and had in fact used it in three previous surgeries at Bethesda without any serious complications.[9] In short, Dr. Billig made an informed decision to use a vent which he thought would do the best job and with which he felt the most comfortable under the circumstances. In such a situation, we decline to substitute our judgment for that of a surgeon choosing a medically acceptable surgical technique.[10]

■ We also choose to give little weight to the testimony of Dr. Haggerson, the primary surgeon in this case, who claimed to have warned Dr. Billig about the inadequate depth of the sutures. First, his claim is wholly uncorroborated. Dr. Licina, the anesthesiologist, testified at trial that he did not recall such a warning being given, and the Government did not elicit testimony from any of the nurses, corpsmen or residents present at that surgery in an effort to confirm Dr. Haggerson's comment. It is also noteworthy that no autopsy was performed on Lieutenant Colonel Kas and thus no physical evidence existed as to the quality of the suturing. Second, we find that Dr. Haggerson's testimony may have been influenced by a personal

---

8. This overmanipulation refers to the lifting of the heart during surgery, not the heart massage in the ICU.

9. Both implicitly at trial and explicitly before this Court, the Government suggested that Dr. Billig did not use the superior pulmonary vent because he did not know how to use it. Without passing on the merit of that suggestion, we note that if in fact Dr. Billig was not taught about the vent during his period of cardiac retraining at Bethesda and was unfamiliar with its use, it would seem that he would have been negligent if he *had* chosen to use it in this case.

10. Our refusal to second guess reasonable medical decisions made by physicians in the course of surgery is closely analogous to our refusal to question judgment calls made by attorneys during the course of providing legal representation. We will not evaluate strategic professional choices from hindsight, but from the perspective of the professional at the time such choices are made, with the presumption that the conduct is reasonable. *See e.g., United States v. Scott,* 24 M.J. 186 (C.M.A.1987), and *United States v. DiCupe,* 21 M.J. 440 (C.M.A.1986).

bias to keep the focus of attention on Dr. Billig and not shift it to himself. While there is no dispute that Dr. Billig chose to use the apex vent and that he placed the sutures around the vent site, the record reflects that it was Dr. Haggerson who apparently did nothing for almost thirty minutes after being told by a unit nurse that the patient was bleeding during the course of intensive care. According to the testimony of ICU personnel, nothing was done to remedy the bleeding problem until Dr. Edwards arrived at 1930. It is apparent, therefore, that Dr. Haggerson did have more than a casual interest in the trial.

In any event, and more importantly, the record reflects that after the purse-string sutures initially tore, Dr. Billig repaired the site with the help of Dr. Haggerson and the two were apparently satisfied at that time that appropriate repairs had been accomplished. The tear redeveloped, however. The fact that even the second set of pledgeted sutures tore through the heart suggests that the primary cause of the bleeding in this case was not shallow suturing, but rather the weakness of the heart tissue itself. Therefore, we find no credible evidence that Dr. Billig placed the initial set of vent sutures too shallowly, or, if he did, that the shallow suturing was the cause of the redevelopment of the tear.

■ We also are unconvinced that either the mistaken grafting of the saphenous bypass to a coronary vein instead of a coronary artery or the alleged overmanipulation of the heart constitutes culpable or simple negligence.[11] At trial, both defense and government experts agreed that artery/vein misidentification happens as an infrequent byproduct of cardiovascular surgery and that this type of mistake is not harmful as long as it is discovered and corrected. That was done in this case. Also, we can see nothing that indicates that the heart was wrongfully overmanipulated. It is clear from the record that the immediate problem both in surgery and afterwards in the ICU was the bleeding from the apex of the left ventricle. In order to expose the apex, however, the surgeon must lift the heart. The repairs could not even have been attempted without lifting the heart. No showing was made by the Government that the lifting of the heart was improper or that any viable alternative existed.

### B. The Estep Case

Mr. Estep was a 66–year–old retired U.S. Navy Petty Officer with a long history of coronary artery disease which included two previous heart attacks, the most recent of which occurred two months prior to surgery. He was referred to surgery because of "significant triple artery disease and impaired ventricular function." Tests performed prior to surgery revealed a severely damaged left ventricle with total occlusion of at least two major coronary arteries. He underwent quadruple bypass surgery on 18 October 1984. Dr. Haggerson was the primary surgeon and Dr. Billig was the first assistant and supervisor.

The initial surgical plan was to fashion a bridge graft (one saphenous vein feeding two coronary arteries) from the aorta to the left anterior descending artery (LAD) and then to the left diagonal artery. Separate bypass grafts were also planned from the aorta to the right coronary artery and to the circumflex coronary artery. After grafting the first saphenous vein to the left diagonal artery, the surgeons prepared to graft onto the LAD and then complete the bypass by hooking up to the aorta. Upon opening the LAD, however, they discovered that the artery was too small to properly accept a graft, and they decided not to graft onto that artery. The opening was sewn shut, but bleeding continued. Dr. Billig then decided to ligate (tie off) the LAD altogether. The remaining bypasses were grafted apparently without incident, using saphenous veins with a lumen (hollow opening) of approximately six millimeters grafted to coronary arteries with lu-

11. Culpable negligence is required to prove involuntary manslaughter, whereas simple negligence would support a conviction of the lesser included offense of negligent homicide. *But see* footnote 1, *supra.*

mens ranging between 1.3 and 2 millimeters.

Petty Officer Estep was cared for in ICU for four days after surgery without serious complications. On the fifth day, however, he went into cardiac arrest. Dr. Haggerson began resuscitation efforts by reopening the chest and starting open heart massage. After about 45 minutes of massage, the patient's right ventricle eroded to the point that Dr. Haggerson's thumb ruptured through the heart wall and the patient died.

In this case, Dr. Billig was charged with and convicted of the culpably negligent killing of Petty Officer Estep by "improperly selecting or allowing to be selected, saphenous vein conduits and coronary arterial connection sites, improperly sewing or allowing to be improperly sewn, saphenous vein connections, and improperly damaging or allowing to be improperly damaged, the left anterior descending artery, thereby creating impeded coronary artery perfusion...." The bulk of the prosecution's case centered on two allegedly culpable acts—Dr. Billig's decision to ligate the LAD, and the improper sewing of the saphenous vein grafts to the coronary arteries (the saphenous veins being too large in comparison to the arteries), thus causing blood clotting, inadequate blood flow to the heart and, ultimately, death.

We again reject the Government's argument because we simply find no negligence, gross or simple, on the part of Dr. Billig. Both government and defense experts agree that the decision not to graft onto the LAD was proper because if the graft had been accomplished the blood flow to the left diagonal artery could have been severely compromised. What is really in issue here is the decision to ligate the artery after having chosen not to use it as part of the bridge graft. It is important to note two critical factors in this regard. First, the surgeons were faced with a bleeding artery that was irreparable. Second, the LAD was completely occluded above the sight of the incision and therefore there was no direct blood flow feeding the left ventricular wall of the heart. This was confirmed by both the cineangiogram done prior to surgery and the fact that this same area of the heart had been severely damaged by a previous myocardial infarction. Because the LAD was blocked off above the site of incision, the surgeons determined that ligation would have a minimal effect on the overall blood flow to that portion of the heart since the area would still be fed collaterally by retrograde filling from other arteries. Both defense and government experts agreed on this point. Indeed, one government expert witness testified that he just could not be sure that the ligation of the LAD had anything to do with the patient's death. Even if the ligation of the artery played a role in the death of the patient, however, we would not reach a different conclusion because the Government produced no evidence whatsoever to show that the situation was brought on by any surgical negligence on Dr. Billig's part. In fact, the evidence shows that the surgeons acted properly throughout the operation and that ligating the artery, under these circumstances, was the only reasonable course of action.

As for the suturing of the saphenous vein grafts, the autopsy performed on Petty Officer Estep revealed that the grafts were distended and clotted with blood. This clotting occurred, according to the report, because of the disparity in size between the saphenous grafts and the coronary arteries. More precisely, because the saphenous veins were approximately 6 millimeters in diameter and the coronary arteries were only between 1.3 and 2 millimeters in diameter, more blood flowed to the graft site than beyond it, thus causing the blood to back up and clot. From this evidence, the Government extrapolates culpable negligence on the part of Dr. Billig. But again, the evidence does not support this conclusion even though the disparity in sizes may have contributed to his death.

There is apparently no hard and fast rule regarding the propriety of suturing large saphenous veins to smaller coronary arteries. In fact, three cardiothoracic surgeons testifying for the defense indicated that the disparity in size between the veins and arteries in this case was within the "stan-

dards of good practice." For example, Dr. Corso, a cardiothoracic surgeon who performs hundreds of bypass operations per year, testified that the vein-to-artery match in this case was perfectly acceptable and within the standard of care expected from cardiothoracic surgeons. Likewise, Dr. Effler and Dr. Bregman, both internationally renowned cardiothoracic surgeons and pioneers in the field of cardiovascular surgery, testified that the grafts made in this case were "definitely acceptable." We find Dr. Effler's testimony in this regard to be most telling.

> Q. I would like you to first address, if you would, doctor, the using of a six millimeter saphenous vein graft, whether that was within the range of normalcy, whether or not that did or did not meet the accepted standards and techniques of the good and approved cardiothoracic surgeons in 1984?
>
> A. I think if that's the best vein grafts a patient has, there's nothing unacceptable about them, no. You have to use what the patient offers you.
>
> Q. All right. Let's discuss the arteries as being 2 millimeters, one and a half, and 1.3.
>
> A. Those are small arteries.
>
> Q. All right, sir. Is it in accordance with the accepted standards of good practice to graft arteries of 1.3, 1.5, and 2 millimeters?
>
> A. Yes.

Record at 8655–56.

Additionally, the Government's primary expert in this case, Dr. Urschel, testified that it was not improper to graft large saphenous veins onto small arteries.

> Q. What is your opinion, sir, regarding any cause and effect between the disparity of size of the saphenous veins to coronary arteries, where the saphenous veins are, say, four times larger than the coronary arteries, regarding subsequent occlusions?
>
> \* \* \* \* \* \*
>
> A. The size of the saphenous vein to the coronary artery varies a great deal de-

pending on who's doing it and who's [sic] philosophy you're following. You can have large veins to smaller arteries if the anastomosis is tailored properly and sutured properly. If it isn't, or if there is any stenosis, or if it is put in a way that is not so-called "streamlined", then you will have problems with that. *The philosophy in this regard varies a great deal in the field of cardiovascular surgery. But I wouldn't object to a larger vein, smaller artery.*

Record at 5217. (Emphasis added).

Based upon this state of the evidence we reject the contention that the vein grafting in this case was criminally negligent.

■ The Government further argues that the clotting of the saphenous vein grafts was caused by the surgical stenosis (narrowing) of the graft sites, that is, that the bypass connections were narrowed by poor suturing technique. We disagree. The autopsy report indicated that the clotting of the saphenous veins was the result of the disparity in size between the veins and the coronary arteries, and it made no mention of any surgical stenosis of the graft site. But even if the evidence revealed that stenosis of the grafts did cause the death of the patient, we would not reach a different result primarily because the suturing in this operation was performed by Dr. Haggerson and not the appellant. The Government offered no evidence that the appellant, in his role as the supervisor of Dr. Haggerson, acted in a negligent manner in performing his supervisory duties, and, in fact, the record reflects that the grafts in this operation were tested by Dr. Haggerson during surgery and were found to be acceptable.

### C. The Grubb Surgery

Major Grubb was a 73–year–old retired U.S. Army officer with a history of coronary artery disease and a previous heart attack. Upon admission to Bethesda he was suffering from severe angina (chest pain) and tests performed prior to surgery revealed partial occlusions of both the LAD and the diagonal artery, as well as the complete occlusion of the right coronary

artery. Major Grubb underwent bypass surgery on 8 August 1984.

This operation, like the others, was performed by Dr. Haggerson as the primary surgeon and Dr. Billig as the first assistant and supervisor. Prior to surgery, two grafts were planned—a single graft from the aorta to the posterior descending branch of the right coronary artery, and a bridge graft going sequentially to the LAD and to the left diagonal artery. During surgery it was decided instead to connect the single graft from the right coronary artery to the LAD bridge graft, thereby creating a "Y" graft and leaving one saphenous vein feeding the three bypasses.[12] After the grafts were completed, the patient was successfully weaned off the bypass machine. In short, the operation proceeded well and was completed without significant incident.

Major Grubb entered the ICU at 1500. Nursing notes reflect that his condition was relatively stable until approximately 1930 when his blood pressure started to drop. Attempts initiated to increase this pressure were largely unsuccessful. At 2050, Major Grubb went into heart block and cardiac arrest occurred. His pacemaker, which had not been activated, was immediately turned on and his heart was restarted. Approximately one hour later, however, Major Grubb's heart arrested again and he died despite resuscitation efforts by Dr. Haggerson and Dr. Lee.

As a result of the death, Dr. Billig was charged with involuntary manslaughter by "wrongfully fashioning or allowing to be wrongfully fashioned, saphenous vein bypass conduits in such a manner that a small conduit with an inadequate lumen was the only conduit connected to his aorta...." He was found guilty of the lesser included offense of negligent homicide, in violation of Article 134, UCMJ.

We are unconvinced of appellant's guilt of this offense. The primary issue in this case concerns the proximate cause of Major Grubb's death. The Government argues that death occurred because of the surgical stenosis of the graft sites, that is, that the connection of the "Y" graft to the aorta was sutured in such a way so as to restrict the flow of blood through the bypasses. The defense, on the other hand, argues that Major Grubb's death was precipitated by hyperkalemia, a metabolic imbalance that directly impairs the heart's ability to pump blood.

Laboratory reports on blood samples taken just prior to the first arrest revealed the patient's blood potassium level was 6.6, a potentially lethal level. Subsequent blood draws reflected the potassium level to be 7.3 at 2120 and 6.9 at 2210. The nursing notes reflect that "efforts to lower the patient's potassium level were initiated during arrest." Dr. Haggerson's post-mortem notes indicate that the hyperkalemia might have contributed to the first arrest during which there was low blood flow to the new grafts, causing possible clotting and ischemia (lack of blood) which probably led to irreversible cardiac failure and arrest.

Based on the state of the evidence, we do not know for certain what caused this patient's death. The Government's primary witness was Dr. Roberts, a pathologist, who testified that Major Grubb's death was caused by the surgical stenosis of the bypass graft and the ensuing lack of blood to the heart. The court members were shown pictures of the narrowed grafts and heard testimony from several other experts who testified that it was a lack of blood supply and not a metabolic imbalance that caused Major Grubb's heart to stop. However, several defense experts testified that, in their opinion, the abnormally high level of potassium present in Major Grubb's body just prior to his death was the cause of his

---

**12.** There is conflicting testimony as to why the decision was made to use the "Y" graft instead of the planned dual graft bypass. Dr. Haggerson testified that the "Y" graft was used because the surgeons cut the saphenous vein too short, and thus the vein was not able to reach from the coronary artery to the aorta. Dr. Billig testified, however, that the "Y" graft was used because the aorta was discovered to be "tortuous and friable," that is, very brittle. Using the "Y" graft, according to Dr. Billig, was necessary because he did not want to place two holes in the fragile aorta.

heart failure. As noted earlier, Dr. Haggerson's post-mortem notes cited hyperkalemia as a possible cause of death, and even Dr. Zajtchuk, a main prosecution witness, testified that potassium levels "may have been a contributing factor." Additionally, the autopsy performed on Major Grubb listed the probable cause of death as being "attributed to a possible arythmia or metabolic imbalance," and it stated that the saphenous vein grafts "were intact and patent", or in other words, were adequately sutured and open for blood flow.[13] Given the confused and often conflicting nature of the evidence presented at trial, we find it difficult, if not impossible, to determine to any precise extent the cause of Major Grubb's death except to say that it occurred after an operation that was supervised by Dr. Billig. Criminal liability cannot flow from such a tenuous relationship.

Even if it were proven, however, that poor surgery caused this patient's death we would not reach a different result for very much the same reasons set forth in our analysis of Petty Officer Estep's death. It bears repeating that Dr. Haggerson and *not* Dr. Billig was the primary surgeon and actually performed the suturing complained of by the Government as being the cause of Major Grubb's death. While the prosecution introduced a great deal of evidence in an attempt to show the failings of Dr. Haggerson's surgical technique, they produced no evidence to show that Dr. Billig failed in his role as a supervisor. In fact, the record reflects that the saphenous vein selected for the bypass, while somewhat phlebosclerotic, was checked for adequate lumen and judged to be acceptable, and that the grafts sutured by Dr. Haggerson were tested prior to closure by means of both inserting probes into the graft and by flushing cardioplegia solution through the newly constructed by-

pass, with good results. We simply see no negligent act on Dr. Billig's part that had anything to do with the death of the patient.

### III.

When Congress enacted the Uniform Code of Military Justice it created a unique system of appellate review of criminal convictions. Most, if not all, other appellate courts limit their review to deciding matters of law which have arisen based upon the facts determined exclusively at the trial level. The Courts of Military Review of the Armed Forces derive their authority from Article 66, UCMJ, 10 U.S.C. § 866, which states in part:

[The Court] may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

Thus, we can and must decide issues of both fact and law. Our function is not to substitute our judgment for that of the trial court or to second guess its decision. We have a duty to make an independent evaluation, based upon the entire record, of whether the guilt of the appellant has been proven to our satisfaction beyond a reasonable doubt. *See United States v. Turner,* 25 M.J. 324 (C.M.A.1987). In this case we are not so convinced.

### IV.

Even though it is not germane to the ultimate resolution of this case, we believe it is important to comment on what we

13. Another issue that was exhaustively litigated at trial was the conflict between the findings of the pathologists who performed the autopsy on Major Grubb that the grafts were open and intact, and the evidence produced almost two years later by Dr. Roberts showing the grafts to be stenosed to the point that they would not even accept a one millimeter probe. The defense introduced testimonial evidence by several experts that the preserving solution in which the heart was kept between the time of autopsy and the time of trial has a shrinking effect on the tissue. The prosecution, on the other hand, produced expert testimony that the solution has no such effect. This dispute can perhaps be considered as a microcosm of the trial as a whole, that is, conflicting evidence was presented on almost every important factual issue.

perceive to be the Government's flawed theories of prosecution.

## A. "BAD SURGEON" Theory

In an attempt to establish the necessary element of culpable negligence in the involuntary manslaughter specifications, the prosecution was permitted, over timely objection, to introduce evidence from numerous witnesses and documents which essentially amounted to a smear campaign to portray Dr. Billig as a bungling, one-eyed surgeon who should have known better than even to enter an operating room because of his past mistakes and poor eyesight. This tactic should not have been permitted by the military judge. The appellant was forced not only to defend against the charges, but also to explain and account for virtually all of his mistakes, professional setbacks, or surgical misadventures during the previous 20 years. Although some of this evidence may have been admissible to establish awareness of his surgical limitations, we are of the general opinion that as to much of this evidence, Military Rules of Evidence 401, 402, 403, and 404 were either incorrectly applied or were ignored altogether. This "bad surgeon" theory permeated the trial proceedings and undoubtedly influenced the court members' decisions—especially in light of the absence of a properly tailored limiting instruction by the military judge.

In regard to the eyesight problem, it was established at trial that Dr. Billig had poor vision in one eye, although the degree of impairment remains unclear due to conflicting testimony. Indeed, one ophthamologist testified that there was no way to accurately determine Dr. Billig's state of vision during the time in question. However, it was also established through unrebutted testimony that during Dr. Billig's tenure at Bethesda he acted as the primary surgeon in 73 open-heart surgeries involving multiple coronary artery bypass grafts. As primary surgeon he would open the sternum, put the patient on the bypass machine and do most, if not all, of the sewing of the grafts. His first such case was in March of 1983. The patient died, and Dr. Billig was acquitted of involuntary manslaughter in regard thereto at this trial. In every other case he performed as primary surgeon, 72 in all, the operation was successful. This leads us to believe that the appellant was not required to refrain from surgery because of poor eyesight. If he could adequately perform this many consecutive open-heart surgeries requiring the intricate sewing of small veins and arteries, then his vision was either adequate for the job at hand or, even if his vision was seriously impaired in one eye, it did not materially affect his performance in the operating room.

## B. "RESPONDEAT SUPERIOR" Theory

Appellate government counsel contends that the criminal negligence of Dr. Billig was established at trial because he failed in his duty as a supervising surgeon, a duty counsel claims to have been clearly established by the prosecution at trial. Several witnesses explained that operating room personnel must act as a team but also that the ultimate responsibility rests with the staff (supervising) surgeon. A typical comment is found in the testimony of Dr. Zajtchuk, who stated:

> When you have a resident and the staff operating, the staff is responsible for everything that happens in the operating room. He's not only responsible for the resident, he's responsible for the perfusionist and everything else. You have to have a captain of the ship and it's always the surgeon in charge.

Record at 5846.

Indeed, this is not unlike the situation of a ship's captain who finds himself in serious trouble due to a mistake or error in judgment, not by himself, but by his officer of the deck. Due to a long-standing Navy tradition of strict accountability, that commanding officer may very well face administrative sanctions, including loss of command, and he may or may not consider himself morally responsible for the consequences. However, if that commanding officer is court-martialed, unless he was personally involved in an act or omission legally establishing criminal conduct, he will not (or at least should not) be found guilty of a crime. In similar fashion, if the medical

community as a whole, or the Naval medical community separately, wants to hold the supervising surgeon administratively responsible for everything that happens in the operating room, we have no quarrel with that concept. That is none of our business. We draw the line, however, when there is an attempt to make criminal that which is actually administrative. This Court is deeply troubled by the fact that the primary mode of proof used by the prosecution in this case was to highlight the surgical deficiencies of the primary surgeon, Dr. Haggerson, and then impute criminal liability therefor to Dr. Billig in his role as the supervisor. Under the Government's theory of prosecution, Dr. Billig could be found guilty simply by establishing (1) some sort of negligence on Dr. Haggerson's part and (2) a supervisory relationship between the two surgeons. The rest could apparently be inferred. This may be good enough to establish some sort of administrative responsibility or accountability, but such reasoning is patently incorrect when used as a foundation for criminal conduct.

 The guilt of a true crime cannot be established on the basis of *respondeat superior*. Liability in this regard must be based exclusively upon personal causation and not on the acts of another. *See* R.M. Perkins, *Perkins on Criminal Law* Ch. 7, § 6 at 812 (2d ed. 1969); *Commonwealth v. Koczwara*, 397 Pa. 575, 585, 155 A.2d 825, 830 (1959), *cert. denied*, 363 U.S. 848, 80 S.Ct. 1624, 4 L.Ed.2d 1731 (1960). In each of the three manslaughter charges, the prosecution has relied to varying degrees on allegedly incompetent acts of the primary surgeon, Dr. Haggerson, in an effort to show culpable negligence on the part of Dr. Billig. In each instance the Government has neither alleged nor shown any culpable act by Dr. Billig *in his capacity as the supervising surgeon* which could be considered as the cause of the demise of any of his patients.

## C. "STANDARD OF CARE" Theory

During the course of the trial, numerous expert witnesses for the Government testi-fied that in their opinion the medical treatment received by the three deceased patients was below the normal standard of care which should be expected from a board-certified cardiothoracic surgeon. In contrast, several expert witnesses for the defense stated that Dr. Billig's actions and judgment in connection with the three operations in question were within the accepted standard of care. No one could define the "standard of care." Nonetheless, the military judge instructed the members that any deviation from it constituted criminal negligence. The term "standard of care" seemed to be an elusive and rather nebulous concept that may have been most easily viewed, and arguably understood, by looking to the results of the particular surgery rather than to the surgeon's actions during the surgery; that is, if the patient died, the standard of care may have been violated. Unfortunately, this circuitous reasoning was given important meaning when the military judge advised the members that

> [b]oth forms of negligence, as I have defined them for you, culpable and simple negligence, may be determined in part in this case by whether the accused violated the standard of care applicable to a board certified cardiothoracic surgeon.
>
> \* \* \* \* \* \*
>
> It is his duty to possess, that degree of care, skill and proficiency which is commonly exercised by the ordinarily careful, skillful and prudent board certified cardiothoracic surgeon engaged in similar practice under the same or similar circumstances nationwide.
>
> It is his further duty to actually use the care ordinarily exercised.
>
> \* \* \* \* \* \*
>
> If a physician violates any one of these duties, he has committed simple negligence. If he violates one of these in a gross departure from applicable standards, he has committed culpable negligent [sic].

Record at 9283–4.

Based upon this guidance, the members were free to base a guilty finding of invol-

untary manslaughter (gross departure from the standard of care) or negligent homicide (any violation of the standard of care) on a departure from a "standard of care" that had no real definition, instead of on the specific acts or omissions set forth in the specifications, which allegations of negligent conduct were neither read to the members during the instructions nor included in the written instructions given to the members, but only adopted in the instructions by reference to the charges and specifications before the Court.

## V.

From our overall view of this case, we see more of a similarity here to a civil tort action than we do to a criminal prosecution. In this regard, the following excerpt from one of the few reported cases wherein a physician was tried for involuntary manslaughter of a patient, is particularly apropos. In reversing the conviction, the New Jersey Supreme Court stated:

> We of course must keep in mind that this is a criminal case. In a civil action for damages, the question is whether a loss shall remain where it fell or be shifted to him whose act brought it about. The test there is ordinary negligence—the failure to behave as would a reasonable man in such circumstances. The issue being only whether the victim or the actor shall bear the dollar impact, the law goes far in permitting the trier of facts to "infer" both fault and causal connection between the fault and the loss. Indeed, if the total circumstances bespeak a likelihood of fault upon the part of a defendant, the law, for civil purposes, permits a jury to infer negligence even though the precise respect in which there was fault cannot be identified. So here, if the suit were for damages, it could be urged (we of course have no occasion here to pass upon it) that the total picture breathes the probability that defendant was careless somewhere and that his unidentifiable carelessness brought about these deaths. And in that connection, we would not be troubled by the possibility that one of defendant's nurses may have been the

careless actor, since for the purposes of civil liability, defendant, as the employer of a nurse, must answer for her fault even though he was personally blameless.

> But a criminal case is another matter. The injury to be vindicated is not the personal wrong suffered by the victim but rather an outrage to the State. And the question is not whether a defendant should absorb the dollar loss of his victim but whether his conduct justifies stamping him a criminal and sending him to State Prison. In that inquiry, the test is not ordinary negligence—behavior of which men of the highest character are capable. Rather, as phrased in 1 Warren, Homicide (perm. ed. 1938), § 86, p. 424:

> > "Negligence, to be criminal, must be reckless and wanton and of such character as shows an utter disregard for the safety of others under circumstances likely to cause death."

*State v. Weiner*, 41 N.J. 21, 25–26, 194 A.2d 467, 469–70 (1963).

In Dr. Billig's case, perhaps those making prosecutorial decisions lost sight of the fact that coronary artery bypass surgery is an inherently risky business, performed only within approximately the last 30 years, and that those patients who agree to this elective surgery are quite ill in the first place, many of them gravely so. Even when all goes well, there is a substantial risk of dying from nothing more than the traumatic ordeal the body is subjected to in this attempt to improve or sustain their life. People die from complicated surgeries, and the fact that there are complications and resultant death does not necessarily mean that any negligent act on the part of medical personnel occurred—or if some negligent act did occur, that anyone is criminally responsible therefor. Given the critical nature of the work and its complexity, these surgeons face a difficult enough task without having to worry about the spectre of the criminal prosecutor—waiting to reduce to a charge sheet honest mistakes which fall far short of the gross, wanton, and deliberate misconduct, with an

accompanying *mens rea*, that truly deserves punishment.

Although the above discussion expresses our distaste for holding a physician criminally liable for simple negligence, the Court does not decide that issue today. It is unnecessary to do so because, as explained earlier, under the exercise of our powers under Article 66, UCMJ, we are not convinced beyond a reasonable doubt that the deaths that formed the basis of the appellant's conviction were due to any negligence, simple or otherwise, on his part.

Accordingly, the findings of guilty and the sentence are set aside. All charges and specifications are dismissed. All rights, privileges, and property of which the appellant has been deprived shall be restored.

Judges GLADIS, CASSEL, and ALBERTSON concur.

COUGHLIN, Judge (concurring):

I fully concur with the Court's decision in all material respects and write separately only to say that I do not question Dr. Haggerson's credibility.

Judge RUBENS concurs with Judge COUGHLIN.

MIELCZARSKI, Judge (concurring/dissenting):

I would set aside the guilty finding of involuntary manslaughter as it pertains to Lieutenant Colonel Kas because of evidentiary and instructional errors alluded to in the majority opinion. I would authorize a rehearing on that single specification and charge. Otherwise I concur in the result reached by the majority.

Chief Judge BYRNE took no part in the consideration or decision of this case.