UNITED STATES NAVY–MARINE CORPS COURT OF MILITARY REVIEW, Petitioner,

v.

The Honorable Frank C. CARLUCCI, III, Secretary of Defense; June Gibbs Brown, Inspector General, Department of Defense, and Rear Admiral Hugh D. Campbell, U.S. Navy, The Judge Advocate General of the Navy, Respondents.

Misc. Dkt. No. 88–31.

U.S. Court of Military Appeals.

July 22, 1988.

For Petitioner: *Patrick J. Carome*, Esq. and *Stephen W. Preston*, Esq. (argued); *Deanne C. Siemer*, Esq. (on brief).

For Respondents: *Lieutenant Commander Lawrence W. Muschamp*, JAGC, USN (argued); *Captain Wendell A. Kjos*, JAGC, USN (on brief).

*Amici Curiae: Major General Keithe E. Nelson* and *Colonel Michael D. Wims* (on brief), for United States Air Force.

*Joseph H. Baum* (on brief), for United States Coast Guard Court of Military Review.

*Opinion and Order of the Court*
EVERETT, Chief Judge:

The United States Navy-Marine Corps Court of Military Review (hereafter the Court of Military Review or petitioner), filed with this Court a petition seeking extraordinary relief in the nature of an injunction against respondents. According to this petition, respondent Inspector General intended to investigate an allegation that some type of improper influence had been exerted against petitioner and its member judges in connection with the appellate review of the court-martial conviction of Commander Donal Billig. *See United States v. Billig*, 26 M.J. 744 (N.M.C.M.R. April 13, 1988) (*en banc*).[1]

The urgency of the situation was reflected in petitioner's allegation that "[a]t about 1700 on 29 June 1988, the Petitioner's Chief Judge received a direct order from the Judge Advocate General of the Navy that the Chief Judge make the Petitioner's commissioners available in the Petitioner's chambers at 0930 on 30 June 1988 to wait the summons of the Respondent's investigators for interviews." Moreover, as recited in the affidavit of petitioner's Chief Judge Edward M. Byrne, respondent's "investigation is to be carried out by interrogating court personnel or by examining internal court decisional material."

We responded by issuing an order immediately that respondent Inspector General not proceed with the proposed investigation until a full hearing could take place before us on July 11, 1988. We also appointed counsel to represent petitioner, which had asserted that it was unable to obtain counsel for itself.[2] Subsequently, a hearing was

---

1. Billig had been convicted by a general court-martial of various charges, including involuntary manslaughter, negligent homicide, and dereliction of duty, in violation of Articles 119, 134, and 92 Uniform Code of Military Justice, 10 U.S.C. §§ 919, 934, and 892, respectively; and he

had been sentenced to dismissal, 4 years' confinement, and total forfeitures.

2. We are grateful to counsel for accepting the appointment with no advance notice and immediately commencing the vigorous representation of petitioner.

conducted on July 11; and, with the benefit of the excellent briefs and arguments by the parties,[3] we now reach our decision.

## I

### Jurisdiction

Respondents have contested this Court's jurisdiction to grant relief; and in this connection they have emphasized that our authority derives from Article I—rather than Article III—of the Constitution. We recognize that Congress has not chosen to confer upon this Court the "judicial power" provided by Article III. Moreover, Congress is not permitted to confer certain powers upon an Article I court. For example, Congress cannot authorize bankruptcy judges to decide common law causes of action which always had been subject to trial by jury. *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

■ However, petitioner's claim is quite different from that which was involved in *Northern Pipeline.* Here, petitioner is itself a court established by Congress pursuant to its power under Article I, § 8, cl. 14, to provide rules for the government and regulation of the land and naval forces; and respondents are officers within the Executive Branch. Petitioner is seeking relief from this Court, which also was established under Article I, § 8, cl. 14, and to which Congress has assigned considerable responsibility for maintaining the independence, integrity, and fairness of the military justice system. We are convinced that, in the exercise of its constitutional authority as to the armed forces, Congress may grant an Article I court, such as this Court, the power to prevent officials of the Executive Branch from interfering with the administration of military justice. *Cf.* Fallon, *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv.L.Rev. 916, 918 (1988).

Thus, the question is not whether Congress may lawfully grant this Court authority to issue extraordinary writs to prevent members of the Executive Branch from interfering with the military justice system; but whether it intended to do so. Under our interpretation of Articles 67, 66, 37, and 98 of the Uniform Code, 10 U.S.C. §§ 867, 866, 837, and 898, respectively and of the All Writs Act, 28 U.S.C. § 1651(a), Congress clearly had this intent.

■ The original decision in 1950 to give this Court the title "Court of Military Appeals"—rather than one of the other names that had been suggested—is one indication of the Congressional intent concerning our powers. During consideration of the Uniform Code, the legislative purpose that the Court be independent was expressed by Representative Philbin: "This Court will be completely detached from the military in every way. *It is entirely disconnected with [sic] the Department of Defense or any other military branch, completely removed from any outside influences.*" 95 Cong. Rec. 5726 (1949) (emphasis added).

Consistent with its title and with its understanding of the underlying Congressional intent, this Court held in 1966 that it was included within the All Writs Act, which provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate *in aid of their respective jurisdictions* and agreeable to the usages and principles of law." (Emphasis added.) *See United States v. Frischholz*, 16 U.S.C.M.A. 150, 36 C.M.R. 306 (1966). In 1967, we ruled that, under the All Writs Act, we could entertain petitions for extraordinary relief even before completion of trial by court-martial. *Gale v. United States*, 17 U.S.C.M.A. 40, 37 C.M.R. 304. In this connection, we pointed out:

To hold otherwise would mean that, in every instance and despite the appearance of prejudicial and oppressive measures,...[an accused] would have to pursue the lengthy trial of appellate review—perhaps even serving a long term of con-

---

**3.** We also received *amicus curiae* briefs from the Judge Advocate General of the Air Force and the United States Coast Guard Court of Military Review.

finement—before securing ultimate relief.

*Id.* at 43, 37 C.M.R. at 307.

In *United States v. Bevilacqua*, 18 U.S. C.M.A. 10, 39 C.M.R. 10 (1968), the Court rejected a government argument that we were helpless to act in a case where the sentence, as approved, was not within those cases set out in Article 67(b) of the Code. Citing *Frischholz* and *Gale,* we observed:

> These comments and decisions certainly tend to indicate that this Court is not powerless to accord relief to an accused who has palpably been denied constitutional rights in any court-martial; and that an accused who has been deprived of his rights need not go outside the military justice system to find relief in the civilian courts of the Federal judiciary.

*Id.* at 11–12, 37 C.M.R. at 11–12.

Instead of disapproving this Court's interpretation of its powers, Congress acted in 1968 to strengthen them by renaming the Court "The United States Court of Military Appeals" and by providing that it be "located for administrative purposes *only* in the Department of Defense." Art. 67(a)(1), Pub.L. No. 90–340, § 1, 82 Stat. 178 (emphasis added). As Chief Judge Quinn pointed out in his comments on this legislation:

> The really important provision contained in this bill is that it establishes the U.S. Court of Military Appeals as a judicial tribunal in every sense of the word. In the past there have been intimations at least that it really was only an administrative agency. This bill removes any doubt about its full stature as a U.S. court. *It increases its standing and prestige in the judicial hierarchy and, by implication, gives it the full powers of a U.S. court.*

H.R. Rep. 1480, 90th Cong., 2d Sess. 3 (1968), *reprinted in* 1968 U.S. Code Cong. and Admin. News (hereafter U.S.C.C.A.) 2053, 2055 (statement of Chief Judge Robert E. Quinn) (emphasis added).

Judge Kilday observed that "[t]his provision establishes the status of the court as a court in the true sense and under the Constitution. This is of the greatest importance." *Id.* at 5; U.S.C.C.A. 2057. The House report which accompanied the 1968 legislation stated that "[t]he bill makes it clear that the Court of Military Appeals is a court and *does have the power to question . . . any executive regulation or action as freely as though it were a court constituted under article III of the Constitution."* *Id.* at 2; U.S.C.C.A. 2054 (emphasis added).

In 1969, the Supreme Court recognized that the All Writs Act applies to the Court of Military Appeals. *Noyd v. Bond,* 395 U.S. 683, 695 n. 7, 89 S.Ct. 1876, 1883 n. 7, 23 L.Ed.2d 631. Indeed, in *Noyd* it required that all review procedures available within the military justice system be exhausted before any collateral attack was allowed in a Federal district court.[4]

In *McPhail v. United States,* 1 M.J. 457, 460 (C.M.A.1976), the Court—after referring to *Frischholz, Gale,* and *Bevilacqua* —asserted that "an accused who has been deprived of any fundamental right under the Uniform Code 'need not go outside the military justice system to find relief in the civilian courts of the Federal judiciary.' " The Court also asserted that it acts as a supervisory authority over courts-martial, since it is the highest court within the military justice system.[5]

---

**4.** Similarly, several years later in *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), the Supreme Court required that attacks on the service-connection of alleged misconduct being tried by courts-martial—service-connection being at the time a requirement for military jurisdiction (*see Solorio v. United States,* ___ U.S. ___, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987))—be fully pursued within the military justice system before an Article III court intervened.

**5.** In 1983, Professor E.H. Cooper, a leading authority on the Federal courts, suggested that this Court should take a very broad view of its power under the All Writs Act in order to attain the objectives for which Congress had established it. He suggested that the "notions of 'inherent power' drawn from the particular needs of the military justice system, may be enough" to warrant invocation of the extraordinary writ power. *See* Cooper, *Extraordinary Writ Practice in Criminal Cases: Analogies for the Military Courts,* 98 F.R.D. 593, 604, delivered at the Eighth Annual Homer Ferguson Conference on Appellate Advocacy on May 18, 1983.

In 1983, the Government argued in *United States v. Matthews*, 16 M.J. 354 (C.M.A.), that this Court could not declare unconstitutional the death penalty procedures then in effect under the Manual for Courts-Martial and that relief in this regard could only be obtained from an Article III court. We concluded, instead, that Congress meant for this Court to consider constitutional issues involved in a court-martial proceeding—even when a statute or a regulation having the force and effect of law was involved.

Far from rejecting this interpretation of the Court's powers, Congress enacted legislation authorizing the Supreme Court to review upon writ of certiorari the decisions of this Court in which review had been granted here. 10 U.S.C. § 867(h)(1); 28 U.S.C. § 1259. Thus, a procedural mechanism was provided for direct appellate review of our decisions by an Article III court—the Supreme Court—in cases where we had decided constitutional issues or other significant issues. Since review of our decisions is now available directly from the Supreme Court, there is even less reason than previously to require that litigants within the military justice system seek relief from the Article III courts.

We have entertained petitions for extraordinary relief to decide a variety of issues. In *Shepardson v. Roberts*, 14 M.J. 354 (C.M.A.1983), the question was whether the Government could repudiate a pretrial agreement. In *Murray v. Haldeman*, 16 M.J. 74 (C.M.A.1983), we considered whether a court-martial had jurisdiction to try a servicemember who had used a psychoactive drug in private while on extended leave far away from any military installation. In *Woodrick v. Divich*, 24 M.J. 147 (C.M.A.1987), we enjoined a trial by court-martial until certain proceedings could be completed in the civilian courts. Sometimes the Government has sought extraordinary relief, *Dettinger v. United States*, 7 M.J. 216 (C.M.A.1979), and occasionally a civilian has been named respondent. *See, e.g., Levy v. Resor*, 17 U.S.C.M.A. 135, 37 C.M.R. 399 (1967).

In situations where a military commander or other servicemember is alleged to have exercised unlawful influence on a court-martial, we have not hesitated to grant extraordinary relief, if this seemed necessary to deal with the threat. After all, "[c]ommand influence is the mortal enemy of military justice." *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). However, in the present case, the alleged threat originates not with a military commander but with a civilian—the respondent Inspector General.

In our view, this does not change the situation. In the first place, Congress could hardly have intended that this Court would be helpless to take action to protect the independence and impartiality of military tribunals—which are essential in assuring a servicemember's right to due process, *cf. United States v. Thomas, supra* —when they were threatened by the action of civilians. Even more important, petitioner has alleged that the respondent Inspector General seeks to accomplish her objective by use of an order from a military superior to a subordinate.

In this connection, we observe that, under § 6 (a)(4) of the Inspector General Act of 1978, 5 U.S.C.App. § 6, an Inspector General is authorized

> to require by subpoena the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by this Act, which subpena, in the case of contumacy or refusal to obey, shall be enforceable by order of any appropriate United States district court: Provided, That procedures other than subpenas shall be used by the Inspector General to obtain documents and information from Federal agencies.

This statutory authority to issue subpoenas apparently contemplates only a subpoena *duces tecum*, whereby the person subpoenaed is required to produce documents; and we have not located any specific authority in the Act for a subpoena *ad testifi-*

*candum,* whereby the recipient is required to appear for answering questions. In any event, respondent Inspector General did not choose to utilize in this investigation a subpoena, which would be subject to judicial scrutiny in connection with its enforcement in a Federal district court. Instead, she proceeded by asking the Judge Advocate General of the Navy to order Chief Judge Byrne to have court personnel present at a specified time and place for interview by her agents. In requesting such assistance, she apparently was utilizing her authority to request assistance from any Federal agency or unit thereof. *See* § 6(a)(3), Inspector General Act of 1978.

■ A major objective of the military justice system is to obtain obedience by subordinates to orders of their superiors. Trial by court-martial is the enforcement mechanism which Congress has provided to assure that obedience is obtained. To this same end, the President has authorized severe penalties for disobedience. Thus, if Chief Judge Byrne—a member of the Navy—had disobeyed the order of his superior, the Judge Advocate General, he could be tried by a general court-martial and would be subject to a maximum punishment of dismissal, confinement for 5 years, and total forfeitures of pay and allowances. Of course, if he were tried, convicted, and sentenced to as much as a dismissal or confinement of a year or more, the case would be subject to this Court's potential appellate review. *See* Arts. 66 and 67. In view of these potential consequences of disobeying the order, we are convinced that extraordinary-writ jurisdiction exists here, pursuant to our precedents authorizing grants of extraordinary relief by reason of our potential appellate jurisdiction.

Respondent Inspector General has emphasized that, although Commander Billig received a court-martial sentence which, under Article 66 of the Code, was subject to automatic review by Court of Military Review, and under Article 67(b), the accused or the Government then could have brought the case to this Court for further review pursuant to Article 67(b), that case has now been finally disposed of without reaching this Court and can in no way come before us for review.[6]

Assuming that this conclusion is correct and that there is no way in which Commander Billig's case could ever reach this Court for review, that circumstance does not affect our jurisdiction to entertain the petition. This petition does not concern harm threatened to Billig but to Chief Judge Byrne and his fellow judges—harm which could result from their being tried by a court-martial if they disobeyed the order from the Judge Advocate General.

Moreover, we are mindful of these "serious concerns" expressed in the affidavit of Chief Judge Byrne:

(a) The current judges and those who follow them could be intimidated by the threat of investigation into unpopular decisions by interrogation of the judges and court personnel;

(b) The appellants whose cases are heard by the court could lose confidence that the court is an independent tribunal that would hear their cases impartially;

(c) Military commanders in the field who rely on the court to dispel any appearance that courts-martial are a tool of the command structure would be made less effective;

(d) Persons in the military service and the public generally would doubt the ability of this court to function independently and fairly because of improper influence from the military command structure;

(e) The court's personnel would be demoralized and be made less effective in their positions; and

(f) The work of the court would be disrupted.

---

6. According to counsel for respondents, the *Billig* case could not be reopened and the decision therein could not be set aside, even if it were later demonstrated that the decision had been the result of fraud or bribery (*but see* argument to the contrary in the brief filed by amicus curiae on behalf of the Coast Guard Court of Military Review, on file in the office of the Clerk of this Court).

Similar concerns are recognized by the Judge Advocate General of the Air Force, when in his *amicus curiae* brief he states:

If some sort of misconduct has distorted the deliberative process of the Navy-Marine Court, this Court may choose to inquire whether cases other than *United States v. Billig* have been affected. In the exercise of this Court's powers to preserve potential Article 67 jurisdiction in those other cases, this Court has traditionally been concerned with the question of improper influence on a subordinate court. *United States v. Snyder*, 18 U.S. C.M.A. 480, 40 C.M.R. 192 (1969). To resolve this concern this Court may judicially notice that many Navy and Marine cases are currently pending before the Court pursuant to Article 67 and may express this concern by specifying the issue in each case, although not initially raised by counsel.

Accordingly, the Court of Military Appeals may issue orders and make inquiries to preserve its potential jurisdiction and to assist in the adjudication of cases pending before it.

Recently, in connection with the Eleventh Circuit investigation of Judge Alcee L. Hastings, a judge of the United States District Court for the Southern District of Florida, the Eleventh Circuit recognized a qualified judicial privilege protecting the confidentiality of judicial communications. *Matter of Certain Complaints Under Investigation By An Investigating Committee of the Judicial Council of the Eleventh Circuit* (hereafter Matter Under Investigation), 783 F.2d 1488, 1517 (11th Cir.), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986).[7] This "privilege is grounded in the need for confidentiality in the effective discharge of the federal judge's duties." *Id.* at 1520. Implicit in the existence of the privilege is recognition that the full and frank exchange of ideas among judges or between a judge and his staff may be chilled and obstructed if those discussions are revealed outside the court.

Essentially, petitioner is alleging that, if this Court does not act, its deliberative processes will be impaired with respect to cases now pending before it and with respect to all future cases that may reach it. Obviously, the number of cases affected is substantial, for currently this Court of Military Review reviews some 4,000 cases per year. In effect, petitioner is warning that, unless relief is granted, its judges henceforth may be reviewing each case with an eye to the possibility that they will be required to explain their decisions to respondent Inspector General. Moreover, each judge will be on notice that even an anonymous tip may generate an inquiry into thought processes. *See Chandler v. Judicial Council of the 10th Circuit*, 398 U.S. 74, 113–17, 90 S.Ct. 1648, 1668–71, 26 L.Ed.2d 100 (1970) (Harlan, J., concurring), for a discussion of important indirect effects on other, future cases within a court's appellate jurisdiction as a basis for exercising extraordinary-writ jurisdiction in the present case.

The harm threatened is not limited to petitioner. The other services also have Courts of Military Review which would be subject to the "chilling effect" caused by the possibility of being investigated by respondent. The members of those courts also will be aware that a decision which is unpopular will be especially likely to result in a complaint to the Inspector General and thereby trigger an investigation.

The danger suggested by petitioner's allegations goes even further. As became clear during oral argument, respondent claims power to investigate not only the Court of Military Review but also the judicial process at the trial level. Thus, a military judge who has presided over a general or special court-martial could be questioned by respondent as to the reasons for his decision, if there were an allegation that in some way he had been subjected to improper influence or had been bribed.[8]

---

7. The panel which rendered the opinion actually was composed of three judges from other circuits who sat by designation, because all the active judges of the United States Court of Appeals for the Eleventh Circuit had recused themselves.

8. In *United States v. Ledbetter*, 2 M.J. 37 (C.M.A.1976), we made explicit our concern when a military judge was asked to explain why he had adjudged some low sentences.

Likewise, the members of a court-martial—who vote "by secret written ballot," *see* Art. 51(a), UCMJ, 10 U.S.C. § 851(a)—might be required by respondent and her agents to explain how they had reached their findings and sentence, if there had been allegations that the court-martial had been subjected to undue influence or bribery.

Moreover, as we understand respondent's position, her right to obtain such information from the members of a court-martial or the judges of a Court of Military Review does not require probable cause or any prescribed quantum of evidence. Apparently, an anonymous call will suffice.[9]

Respondent Inspector General also contends that we have no jurisdiction to restrain her activity because she is a civilian, rather than a member of the armed services. This contention relies in part on an alleged lack of authority of this Court to punish for contempt or to obtain assistance of United States Marshals in enforcing its orders.

As to the contempt power, we are aware that, although under Article 48 of the Uniform Code, 10 U.S.C. § 848, courts-martial have an express power to punish for contempts committed in their presence, Congress has not explicitly granted such power either to this Court or to Courts of Military Review. However, unlike respondents, we do not infer from this omission that judges of this Court or judges of a Court of Military Review would be powerless to protect themselves, even if contemptuous or disruptive behavior took place in their very presence.[10] Instead, it seems arguable that, simply because they were established as "courts," both this Court and the Courts of Military Review have inherent authority to punish for contempt.

However, it is not essential to determine whether we could cite respondents for contempt if they disobeyed our decree or whether we could obtain the assistance of United States Marshals or of other enforcement personnel to enforce our decrees. In the first place, respondents are members of the Executive Branch; and, in our view, the President—who, under Article II of the Constitution, heads the Executive Branch—would have some responsibility to assure that respondents complied with our decrees until they were set aside by higher judicial authority. Undoubtedly, he would have some enforcement mechanism available to obtain compliance.

Secondly, it is within our jurisdiction to determine petitioner's legal rights with respect to the acts intended by respondent Inspector General; and we would anticipate that respondent would abide by our declaration without the necessity for us to undertake enforcement proceedings.[11] Finally, insofar as our jurisdiction depends on availability of an enforcement mechanism, we emphasize again that the Inspector General did not seek to obtain the desired information by use of a subpoena or other legal process—which could not be enforced without providing some type of judicial hearing. Instead, to obtain evidence, she relied on a military order from a military superior.

The severe penalties authorized for disobeying a military order can only be imposèd by a court-martial, and illegality of the order is a defense in a trial by court-martial. Clearly, Congress gave this Court a special responsibility for overseeing trials by court-martial and for interpreting the Uniform Code of Military Justice. Determination of the legality of military orders comes within that responsibility. *Cf. Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976); *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *Noyd v. Bond, supra.*

9. We understand the importance of encouraging and protecting whistleblowers; but, if carried too far, reliance on anonymous tips can produce abuses like those in France at the time of the French Revolution, when a malicious tip or accusation could be fatal for the victim.

10. This is an omission in the Uniform Code to which Congress may wish to give attention.

11. Of course, as respondents' counsel indicated during oral argument, respondents, if dissatisfied with our decree, can seek review in the Supreme Court.

We are sure that Congress never intended for the Inspector General to rely on military orders as a means of performing an investigation and yet contest successfully our jurisdiction to determine the legality of those orders.

## II

### Ripeness

Respondent Inspector General also maintains that, even if at some point this Court has jurisdiction to determine the legality of the order given by the Judge Advocate General of the Navy to Chief Judge Byrne or of other orders that may be directed by military superiors to their subordinates during the course of the investigation, this jurisdiction may only be exercised in connection with the appellate review of a trial by court-martial—a trial in which the legality of the order has been unsuccessfully contested and in which the accused has been convicted and subjected to a sentence of sufficient severity that, under Articles 66 and 67 of the Code, the case reaches this Court for review.

This contention disregards the dilemma to which respondent Inspector General has subjected the judges and staff of the Court of Military Review. If they disobey orders from the Judge Advocate General of the Navy to assist respondent, they subject themselves to severe penalties. Even though illegality of the order may be asserted as a defense, the final decision on that defense may take place much later. Moreover, even if ultimately successful, they may not appropriately perform their duties as appellate military judges while being court-martialed themselves for disobedience.

If, on the other hand, they choose to obey the order and provide the information, their compliance may inflict major harm on petitioner and may disrupt its future judicial processes. Moreover, if they comply and provide the information desired by respondent, it will be difficult—if not impossible—for them subsequently to contest the legality of the order. In whatever forum judicial proceedings might be initiated, respondent undoubtedly would contend that the issue has been mooted and that any opinion would only be advisory.

■■■ Dereliction of duty is also a violation of the Uniform Code of Military Justice, see Art. 92(3), 10 U.S.C. § 892(3). Military judges at the trial or appellate level have a sworn obligation to perform their judicial duties—this obligation existing both under their oaths as military officers and under their oaths as judges. The first Canon of Judicial Conduct requires that judges uphold the independence and integrity of their courts. ABA Code of Judicial Conduct, Canon 1 (1972). When, in 1968, Congress changed the title "law officer" to "military judge" and "board of review member" to "appellate military judge," see Pub.L. No. 90–632, §§ 2(8) and 2(27), 82 Stat. 1336, 1941, it certainly intended that military judges would be subject to this Canon—which is applicable to all other judges throughout the United States. Indeed, for Congress to name someone a "judge" and not intend for him to perform his duties as a "judge" would be to perpetrate a fraud on servicemembers and on the American public. It follows that a military judge—whether at the trial or appellate level—who fails to uphold the independence and integrity of his court is guilty of dereliction of duty and has violated the Uniform Code.

Accordingly, if Chief Judge Byrne and the other judges of the Court of Military Review comply with a military order which threatens the independence and integrity of their court, they may be subjecting themselves to later prosecution for dereliction of duty. Whether they could claim illegality of the order as a defense against such a prosecution is uncertain, since compliance with an illegal order may not be excusable if the person complying did not believe that the order was legal. In light of the dilemma with which the Inspector General has confronted the judges of the Court of Military Review, we are convinced that it is not premature for us to consider now the merits of the petition. Indeed, for us not to do so would be irresponsible.

### III

#### Merits

■ Petitioner has alleged that respondent Inspector General seeks to interview the judges about their decision in *United States v. Billig, supra*, and to have access to their decisional materials. An investigation which inquires into the deliberative processes of a court is quite different from other types of investigations to which a judge might be subject.

For example, we have no question about the authority of the Inspector General to investigate an allegation that an appellate military judge has submitted a false voucher or has made a false claim for reimbursement of travel expenses incurred in performing his duties as a judge. *Cf. Territorial Court of the Virgin Islands v. Richards*, 673 F.Supp. 152 (D.V.I.1987), *aff'd*, 847 F.2d 108 (3d Cir.1988). Investigation of a court's deliberative processes, however, is limited by a judicial privilege protecting the confidentiality of judicial communications. This privilege was recently approved in connection with the investigation of Judge Hastings. *See Matter Under Investigation*, 783 F.2d at 1518–22.

The rationale for the privilege is the same as that which was articulated for the executive privilege—namely, that confidentiality is important for the effective discharge of the duties of a judge.[12] Quoting *United States v. Nixon*, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974), the Court of Appeals of the Eleventh Circuit stated:

[T]he importance of this confidentiality is too plain to require further discussion.

Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.

783 F.2d at 1519. Indeed, the Supreme Court in *Nixon* (418 U.S. at 708, 94 S.Ct. at 3107) "likened '[t]he expectation of a President to the confidentiality of his conversations and correspondence' to 'the claim of confidentiality of judicial deliberations.'" We fully agree that

[j]udges, like Presidents, depend upon open and candid discourse with their colleagues and staff to promote the effective discharge of their duties. The judiciary, no less than the executive, is supreme within its own area of constitutionally assigned duties. Confidentiality helps protect judges' independent reasoning from improper outside influences. It also safeguards legitimate privacy interests of both judges and litigants.

783 F.2d at 1519–20.

■ However, like the executive privilege, *see United States v. Nixon, supra* 418 U.S. at 706–07, 94 S.Ct. at 3106–07, the privilege protecting confidential communications between judges and their staff in the performance of their judicial duties is qualified. Thus, as in the case of Judge Hastings, it sometimes must yield to other considerations. *See Matter Under Investigation, supra.*

As appears from the affidavit of respondent Inspector General, she has

received allegations from an anonymous individual, whom I have reason to believe is an employee of the Department of De-

---

12. A privilege has also been recognized with respect to the deliberative processes of a jury. A juror cannot impeach the jury's verdict, although he can testify about any "extraneous influence." Fed.R.Evid. 606(b); Mil.R.Evid. 606(b), Manual for Courts–Martial, United States, 1984; *Tanner v. United States*, 483 U.S. ——, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). In *Tanner* the Court reiterated:

"[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering

something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *McDonald v. Pless*, 238 U.S. [264], at 267–268, 35 S.Ct. 783 [784], 59 L.Ed. 1300 [(1915)].

483 U.S. at ——, 107 S.Ct. at 2747, 97 L.Ed.2d at 105–06.

fense (either military or civilian), claiming that there was misconduct on the part of members [sic] or staff of the ... Court of Military Review. Generally, the misconduct complained of includes *ex parte* communications and bribery.

The Inspector General also states in her affidavit that she has "no interest, desire, or intention of conducting an investigation into the deliberative processes of the ... Court of Military Review"; that "[u]nless it is necessary to further a criminal investigation, I will not conduct any inquiry into the deliberative processes of the ... Court of Military Review"; that "I am investigating ... [the] allegation [of bribery] without current resort to interviews with members [sic] or staff of the ... Court of Military Review or access to any of their official papers"; and that "I have also initiated a preliminary investigation of the ... Court of Military Review relating to the allegations of *ex parte* communications to determine whether there have been any such communications."

These averments by the Inspector General indicate that her investigation may not invade the areas protected by the judicial privilege. However, petitioner's reconstruction of the oral responses of the Inspector General's representatives, who met with the judges of the Court of Military Review on June 23, 1988, suggests that there is a substantial risk that the inquiry will "intrude into the court's deliberative process" and that, at the very best, there may be some practical difficulties in determining the exact boundaries of the area covered by the judicial privilege.

Under the present circumstances, it appears that respondent's investigation—if pursued in the manner she intends—may encompass areas protected by judicial privilege. Secondly, it seems clear that—whatever may be the quantum of evidence necessary to overcome the qualified judicial privilege—an anonymous tip does not suffice for this purpose; and, up to this point, respondent Inspector General does not

claim to have any greater information than that available from the anonymous informer. Moreover, the authority of the Inspector General is "to conduct and supervise audits and investigations relating to programs and operations of .... the Department of Defense," 5 U.S.C.App. § 2; and we are unconvinced that the deliberative processes of the Court of Military Review constitute a "program" or "operation" of the Department.

There is a substantial risk that, unless we act promptly, the investigation may violate the judicial privilege protecting confidential communications among petitioner's judges and with their staff. The resulting harm might be great and permanent. Therefore, we should provide relief to petitioner in its effort to protect the qualified judicial privilege of its judges and their staff.

## IV

### Remedy

Petitioner not only requests that respondent Inspector General be enjoined from conducting her investigation in a manner that might threaten its independence but also asks that this Court appoint a judicial commission to investigate the allegations of judicial misconduct. In this connection, petitioner asserts that, whatever might usually be the quantum of evidence necessary to initiate an inquiry into allegations of judicial misconduct, it desires investigation by a judicial commission as a means of obtaining exoneration with respect to allegations that have now become widely publicized.

As petitioner has pointed out, this Court has stated that

we deem it appropriate to bar official inquiries outside the adversary process which question or seek justification for a judge's decision unless such inquiries are made by an independent judicial commission established in strict accordance with the guidelines contained in Section 9.1(a) of the ABA Standards, The Function of the Trial Judge.

*United States v. Ledbetter*, 2 M.J. 37, 43 (C.M.A.1976). The standard to which the Court referred provides:

Each jurisdiction should establish an independent commission, composed of lay citizens, lawyers and judges, to investigate complaints of judicial misconduct or incompetence against judges in all courts of the jurisdiction. The commission should be empowered to investigate any such complaint received by it, to employ the subpoena power, appoint hearing officers to examine complaints and receive evidence, and to make findings and recommendations to the highest court in the jurisdiction. Such court should be empowered to remove any judge found by it and the commission to be guilty of gross misconduct or incompetence in the performance of his duties. Provision for censure or suspension should be made for less serious misconduct. In order to protect the participants, provision should be made for keeping all complaints and commission proceedings confidential unless the commission recommends discipline by the highest court, at which time the commission's record, upon being filed with the court, should become public.

ABA Standards, The Function of the Trial Judge 24 (1972).

Congress has also made provision for an internal procedure for investigating complaints against members of the judiciary. *See* 28 U.S.C. § 372(c); *Hastings v. Judicial Conference of the United States*, 829 F.2d 91, 108–09 (D.C.Cir.1987, *cert. denied*, —— U.S. ——, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988). In rejecting constitutional objections to this mechanism—whereby federal judges can be disciplined by other federal judges for "conduct prejudicial to the effective and expeditious administration of the business of the courts," 28 U.S.C. § 372(c)(1)—Chief Judge Levin H. Campbell, sitting by designation, pointed out in *Matter Under Investigation*

that Congress could reasonably have determined that some internal procedure for investigating complaints against members of the judiciary was not only in the public interest but was important to the continued independence of the judiciary as a whole. Judges have very substantial powers and are supported at public expense. Today, some kind of complaint procedure exists with respect to state judges in every state in the union. The judiciary as a whole, including the colleagues of complained-against judges, has an interest in seeing that non-frivolous complaints are looked into, to the end that the judge, and the system he exemplifies, be exonerated or, if not, that the public perceive that the system has undertaken to police itself, within constitutional limits, of course. Absent any form of judicial complaint procedure, courts would be virtually alone among public and professional occupations in lacking a means to clean house. The increase in the number of judges coupled with the increase in the complexity of judicial work and of courts, all suggest that some mechanism for looking into complaints is necessary and reasonable, if only to enable the courts themselves to sort out their own shortcomings and make the necessary administrative adjustments. *In fact, a credible internal complaint procedure can be viewed as essential to maintaining the institutional independence of the courts.* If judges cannot or will not keep their own house in order, pressures from the public and legislature might result in withdrawal of needed financial support or in the creation of investigatory mechanisms outside the judicial branch which, to a greater degree than the Act, would threaten judicial independence....

Second, while the Act may impose some pressures upon judges' independence, the fact that it places the investigation, and the determination of what actions to take, entirely within the hands of judicial colleagues makes it likely that the rightful independence of the complained-against judge, especially in the area of decision-making, will be accorded maximum respect. Because of their own experience, other judges can be expected to understand the demands unique to their profession; and as each is a decision-maker himself, these other judges may be expected to refrain from applying

sanctions that could chill the investigated judge's freedom to decide cases as he sees fit, since such sanctions could be a precedent that could be turned against any judge. Above all, judges will certainly be reluctant to take any action that would predictably inhibit the free and independent functioning of the courts.

*Matter Under Investigation,* 783 F.2d at 1507–08 (emphasis added; footnotes omitted).

 Congress has not chosen to provide explicitly for the creation of a judicial commission or an investigating committee to consider allegations of misconduct by judges within the military justice system. However, we do not believe that this omission reflects disagreement with Chief Judge Campbell's position that it is desirable for the judiciary to have an internal procedure for investigating such complaints. We are convinced that it is within our inherent authority as the highest court within the military justice system and within our supervisory authority under the All Writs Act, 28 U.S.C. § 1651(a), to create an internal procedure for investigating complaints of judicial misconduct within the system. *See Chandler v. Judicial Council,* 398 U.S. at 117 n. 15, 90 S.Ct. at 1670–71 n. 15.

Although 28 U.S.C. § 372(c) has not been made directly applicable to this Court, Courts of Military Review, or courts-martial, it is instructive as to the internal procedure which should be established. We note that 28 U.S.C. § 372(c) provides for an investigating committee, which is headed by the chief judge of the circuit in which the complaint arose and is composed equally of circuit judges and district judges. Thus, unlike the "judicial commission" proposed by the American Bar Association Standards—referred to by us in *Ledbetter*—the investigating committee does not include lawyers and lay members.

With this in mind, it appears to us that if, as part of the relief granted petitioner, we authorize some type of inquiry, this inquiry should take place under the auspices of a body composed of judges. Under the circumstances of this case, it would appear that the simplest and quickest way to proceed is for the "judicial commission" to be this Court itself, *qua* court. In this way, our powers as a court under the All Writs Act will be available in connection with obtaining evidence. *Cf. Matter Under Investigation, supra* at 1496; *Chandler v. Judicial Council, supra* 398 U.S. at 117–19 n. 15, 90 S.Ct. at 1670–71 n. 15. Moreover, some possible procedural questions will be avoided.

Admittedly, to undertake this responsibility will inject us "into an unfamiliar fact-finding role." However, as was remarked when a similar objection was made in connection with the subpoena-enforcement jurisdiction being exercised in the investigation of Judge Hastings, "courts of appeals possess inherent authority to appoint a special master—who could, it seems, be a sitting Article III judge if this were desirable—to assist them in the fact-finding process." 783 F.2d at 1499. By the same token, this Court has authority to appoint a special master to investigate factual issues. *See* Rules 27(a)(4) and 29(d), Rules of Practice and Procedure, United States Court of Military Appeals (effective July 1, 1983) (authorizing appointment of a special master, who may be a military judge or other person, to investigate, take evidence, and make recommendations as to a petition for extraordinary relief and a petition for a new trial, respectively).

In at least one instance the Court has appointed a special master and conferred upon him the necessary powers to investigate factual issues raised by a petitioner for a new trial. *United States v. Capps,* 23 M.J. 405 (C.M.A.1987). Moreover, some of the *DuBay* [13] hearings which we have ordered are the functional equivalent of appointing a military judge to serve as a special master and report to this Court. *See, e.g., United States v. Vietor,* 10 M.J. 69 (C.M.A.1980); *United States v. Killebrew,* 9 M.J. 154, 162 (C.M.A.1980).

---

13. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

In this case, there might be some practical problems in appointing a staff member or a military judge—whether from the trial or appellate level—to serve as a special master for the Court. Accordingly, we turn to another alternative—namely, appointment of one of the judges of this Court to serve as Special Master. For this purpose, the obvious choice is the Honorable Walter T. Cox, III, Associate Judge, who prior to coming to our bench and while serving as a state trial judge, had occasion to serve on various judicial commissions inquiring into allegations of judicial misconduct.

Subject to appeal to the full Court, the Special Master will have full authority to resolve any controversies arising out of or incident to the investigation being conducted by respondent Inspector General. He may enter such orders as he deems necessary to assure that the Inspector General's investigation remains within permissible areas and does not improperly invade petitioner's qualified judicial privilege and the privilege of its judges and staff. Thereby, he can insure that the independence and integrity of the Court of Military Review is maintained.

Respondent Inspector General asserts in her affidavit that she is "the most appropriate person to investigate allegations of misconduct within the ... Court of Military Review." As to some types of misconduct, this may be true. However, insofar as the alleged misconduct concerns judicial deliberations or internal judicial communications, we are convinced that she is in error. Instead, as to the inner workings of the military judicial process, this Court is far more qualified to conduct any needed investigation.[14]

In investigating any allegations of bribery, the Inspector General will be free to subpoena records of persons suspected of offering or receiving a bribe and interview persons not serving on or with the court.

However, with respect to the deliberative process of the appellate military judges or their staff, she will be free to investigate only as permitted by the Special Master, subject to appeal to the full Court. If, at some later time, the Inspector General obtains substantial evidence concerning *ex parte* communications with petitioner court, the Special Master can rule whether the qualified judicial privilege must yield thereto. *Cf. United States v. Nixon* and *Matter Under Investigation,* both *supra.*

The Special Master should be authorized to conduct whatever investigation he considers appropriate in order to determine whether misconduct has occurred on the part of any of the petitioner's judges or staff. For this purpose, he may call such witnesses and take such evidence as he may see fit. Finally, he will report to the full Court the results of his investigation along with recommendations for any corrective action that seems appropriate. The full Court, in turn, can consider his report and then decide how best to proceed.

Recently, this Court held in *Woodrick v. Divich,* 24 M.J. 147, that a court-martial should defer to civilian court proceedings in a case which concerned the validity and interpretation of an enlistment contract. Our decision was predicated on principles of comity and on the premise that, under the circumstances of that case, a civilian court was best equipped to deal with the contractual issues that had been presented. In the case at bar, we seek to provide a remedy that will allow respondent to continue with her investigation of bribery allegations—as well as to interview persons other than the judges and staff of the Court of Military Review about allegations of *ex parte* contacts with that court in the *Billig* case— but will not disrupt petitioner's deliberative processes.

To the extent that the allegations of misconduct concern the deliberative processes

---

14. So far as we are informed, the Judge Advocate General of the Navy has not initiated any investigation of the allegations of judicial misconduct; and it has not been suggested that he intends or has been requested to do so. If such an investigation had been undertaken, a different remedy might have been feasible. *Cf.* R.C.M. 109(a), Manual for Courts-Martial, United States, 1984.

of the Court of Military Review, we believe that they can best be considered under the direct supervision and control of this Court. In this way, the least threat is presented to the independence of the Court of Military Review and of other military tribunals.

We are concerned, however, that we not react too quickly and too broadly to the allegations of judicial misconduct without a factual basis for so acting: Heretofore, we have been furnished no information or evidence which gives us a clue as to how or where to begin an investigation or what or whom to investigate. An investigation without a specific, factual allegation of judicial misconduct would be fruitless.

Consequently, in the beginning, the Special Master shall function in the capacity of protecting the court, its judges, and staff from unlawful intrusion into the deliberative processes. In the event a complaint is filed with the Special Master detailing the allegations against petitioner or any judges thereof, or in the event petitioner provides the Special Master with information giving rise to a belief that judicial misconduct has occurred, then the Master may proceed to investigate the allegations in accordance with this opinion. To the extent it may prove helpful, he *may* adopt the procedures used by the federal judiciary to facilitate judicial investigations under 28 U.S.C. § 372(c), or he may utilize any other procedures which insure procedural and substantive due process to any judge or official under investigation.

We are also mindful of the grave responsibilities that the Judge Advocate General of the Navy has concerning the Court of Military Review. Art. 66. Indeed, he should have been named a party to

this litigation, although as the head of the Department of Defense, the Secretary of Defense represents the interests of the Judge Advocate General. We recognize that no matter in controversy involving this litigation can be expeditiously resolved without the full cooperation of and participation by the Judge Advocate General. Accordingly, we deem it necessary to add him as a party to this action.[15]

## V

## ORDER

Based upon the foregoing, it is by the Court this 22nd day of July, 1988, ORDERED, ADJUDGED and DECREED that:

1. The Judge Advocate General of the Navy is hereby named as a necessary party to this litigation.

2. The temporary restraining order of June 30, 1988, as amended on July 11, 1988, is hereby dissolved, and this order is substituted therefor, granting extraordinary relief to petitioner in the nature of a protective order.

3. The Honorable Walter T. Cox, III, Associate Judge of this Court, is hereby appointed to be Special Master in this case, with full power and authority to consider and rule upon any motions which may hereafter be made by the Inspector General or her duly authorized representatives requesting the production of documents, witnesses, statements, or any other information or material pertaining to the subject matter herein from the judges of the petitioner court or military and civilian staff members employed by said court and its judges, including commissioners, secretaries, clerks, or other support personnel, provided that no interviews or requests for

---

**15.** Respondents' motion to vacate order granting temporary restraining order is denied as moot; respondents' motions to file affidavits of the Inspector General, Department of Defense, and Mr. Steven Whitlock are granted; motions to file *amicus curiae* briefs on behalf of the United States Air Force and the United States Coast

Guard Court of Military Review are granted; petitioner's motion to strike unsworn allegations of contested facts is denied; and the motion to file an *amicus curiae* brief on behalf of one or more former Judge Advocates General of the United States Navy is granted.

information or materials shall issue except upon order of the Special Master.

4. The Special Master shall also consider and rule upon any motions made by petitioner, or any judge of the Court of Military Review, or any clerk, commissioner, staff member or other personnel of the court, requesting such a ruling upon any claim of judicial privilege or any other matters which may from time to time be in controversy arising out of the foregoing investigation.

5. The Special Master shall have full power and authority to receive, consider, and independently investigate any allegations of judicial misconduct of a judge or staff member of petitioner court in connection with petitioner's decision in *United States v. Billig*, 26 M.J. 744 (1988), and to take such evidence as he deems necessary to render a fully informed decision regarding any such complaint; provided, however, that the Special Master is not ordered to conduct any investigation, that decision being predicated upon the existence of good cause. In any event, the Master shall file a final report with this Court concerning all matters herein and shall make such recommendations as he deems appropriate.

6. The Special Master shall have the authority to do that which is just and proper to carry out the order of this Court.

7. This Court shall take such action with respect to the Special Master's report as it may determine is necessary.

8. Any ruling or order of the Special Master shall be appealable to this Court by filing a Notice of Appeal within 5 days; otherwise, the Master's order shall become final.

9. Respondent, the Honorable Frank C. Carlucci, III, or his successors in office, shall cause to have served upon appropriate members of his department a copy of this order with instructions that all are bound thereby.

10. Petitioner court shall preserve all records, documents, and materials of whatever nature that may pertain in any way to petitioner's decision in *United States v. Billig, supra.*

11. This Court shall retain jurisdiction to enter further orders in this cause from time to time.

Judges COX and SULLIVAN concur.